IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**BETTY J. EMERTON,**

       **Plaintiff,**

vs.                                                                                               **No.  02cv1250 DJS**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

## **MEMORANDUM OPINION AND ORDER**

      This matter is before the Court on Plaintiff's (Emerton's) Motion to Reverse or Remand Administrative Agency Decision **[Doc. No. 12]**, filed May 16, 2003, and fully briefed on September 5, 2003.  On May 23, 2002, the Commissioner of Social Security issued a final decision denying Emerton's claim for social security disabled surviving divorced spouse insurance benefits.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to remand is well taken and will be GRANTED.

### **I.  Factual and Procedural Background**

      Emerton, now fifty-three years old, filed her application for disabled surviving divorced spouse insurance benefits on the account of Carl Emerton on October 4, 2000, alleging disability since February 23, 1996, due to degenerative joint disease, reflex sympathetic dystrophy (RSD)[1],

---

[1] Reflex sympathetic dystrophy (also called Complex Regional Pain Syndrome) is a chronic pain state induced by soft tissue or bone injury or by nerve injury in which pain is associated with autonomic changes (e.g. sweating or vasomotor abnormalities) and/or trophic

and gastroesophageal reflux disease (GERD)[2]. Tr. 115. Emerton has a ninth grade education and past relevant work as a developmental disabilities technician. The Commissioner's Administrative Law Judge (ALJ) found Emerton had to establish her entitlement to surviving divorced spouse insurance benefits based on disability during the prescribed period. Tr. 19. The prescribed period in this case is July 20, 1995 (date of Emerton's former spouse's death) to July 31, 2002. *Id.*, Tr. 113.

On May 23, 2002, the ALJ denied benefits finding Emerton had a severe musculoskeletal impairment, but it did not meet or equal in severity any disorder set forth in the Listing of Impairments, Appendix1, Subpart P, Regulations No. 4. Tr. 20. As to Emerton's additional impairments, the ALJ found her hypertension, thyroid disorder, gastrointestinal bleeding, chest pain, sinus headaches, dizziness, insomnia, and depression were nonsevere impairments. *Id.* The ALJ further found Emerton retained "the residual functional capacity (RFC) to perform light work. Tr. 21. The ALJ also found Emerton's "assertions that she does not retain the residual functional capacity (RFC) necessary to light work [were] not credible." *Id.* Emerton filed a Request for Review of the decision by the Appeals Council. On August 24, 2002, the Appeals Council denied Emerton's request for review of the ALJ's decision. Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. Emerton seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

---

changes (e.g. skin or bone atrophy, hair loss, joint contractures). *The Merck Manual* 1372 (17th ed. 1999),

[2] Gastroesophageal reflux disease is the regurgitation of gastric contents into the esophagus. The presence of gastroesophageal reflux disease indicates incompetence of the lower esophageal sphincter. *The Merck Manual* 232 (17th ed. 1999).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

## III.  Discussion

Pursuant to 42 U.S.C. § 402 (e), a surviving divorced wife is eligible for benefits under the deceased spouse's earnings record if certain non-disability requirements are met.  A surviving

divorced wife must be at least 50, and her disability must start within seven years of the death of the spouse (prescribed period). 20 C.F.R. §404.335(c)(1). Disability for a disabled surviving divorced spouse is determined by applying the five-step sequential evaluation process used for disabled workers.

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse, Emerton makes the following arguments: (1) the ALJ's finding that she could perform light work is not supported by substantial evidence and is

legally erroneous; (2) the ALJ's conclusive application of the Medical-Vocational Guidelines (the grids) to find her not disabled at step five of the sequential evaluation process is not supported by substantial evidence and is legally erroneous; and (3) the ALJ's credibility determination is not supported by substantial evidence and is legally erroneous.

### A.  Residual Functional Capacity Determination

"[T]he responsibility for deciding [a claimant's] residual functional capacity rests with the Administrative Law Judge . . . ."  20 C.F.R. § 416.946.  Residual functional capacity is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirement of jobs."  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c).  In arriving at an RFC, agency rulings require an ALJ to provide a "narrative discussion describing how the evidence supports" his or her conclusion.  See SSR 96-8p, 1996 WL 374184, at *7.  The ALJ must "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record."  *Id.*  The ALJ must also explain how "any material inconsistencies or ambiguities in the case record were considered and resolved."  *Id.*  "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence."  *Id.*

The ALJ found Emerton retained the RFC to perform light work.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with

some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [Emerton] must have the ability to do substantially all of these activities.  20 C.F.R. § 416.967(b).  In determining Emerton's RFC, the ALJ found:

> The claimant underwent consultative examination on February 24, 2001 (exhibit 2f). Signs consistent with mild arthritis of the right knee were identified (a result supported by earlier imaging studies on April 3, 2000– exhibit 11f).  The examiner opined that the claimant may have difficulty in performing ". . . heavier types of activities . . . ."  Based upon this opinion, I find that the claimant can reasonably be expected to be limited in her ability to lift and carry weights.  Accordingly, severity for the musculoskeletal body system is established.
>
> * * * * * * * * * *
>
> Imaging studies of the claimant's knees have revealed only mild degenerative changes, with normal left foot and hip results (exhibit 11f).  The claimant has also been noted to exhibit an effusion of the right knee, but this sign is sporadic in nature and not present on a regular basis (id).  There has also been evidence of back pain and radiculopathy with positive straight leg test, but this also appears as a single event (id).  Moreover, the claimant has specifically declined to be referred to orthopedic specialists (id).  She has evidence of left heel pain, but imaging studies have been reported as normal and she has responded to heel pads (id).  There is also a history of right upper extremity reflex sympathetic dystrophy, but current reports describe a stable state and one responsive to medication (id). Finally, as will be shown in my next finding, the claimant retains the ability to walk and perform her activities of daily living.  On these facts, severity involving any section of the musculoskeletal listings is not indicated.
>
> The claimant's assertions that she does not retain the residual functional capacity (RFC) necessary to light work are not credible.
>
> * * * * * * * * * *
>
> The claimant has not submitted any statements from her treating sources that described any work-related limitations during the period in issue.  She did undergo a consultative examination, and this source identified a need to avoid heavier types of actives (sic) (exhibit 2f).  He also noted that the claimant "may" have "some" degree of difficulty in sustaining activities.  However, I find this issue resolved by the claimant's admissions as reflected on page 3 of exhibit 3f.  There, the claimant admits to the ability to perform six separate exertional activities consistent with the ability to perform at least light work.  Moreover, six additional capacities are also admitted, capacities indicating the ability to sustain activity without interference by disabling pain.
>
> On these facts, I cannot accept the claimant's testimonial assertions with respect to the degree, intensity, persistence, and severity of her limitations precluding all work activity.

Tr. 20-22. Thus, in determining Emerton's RFC, the ALJ's relied on Emerton's medical records, Dr. Davis' consultative evaluation, and "admissions" the ALJ contends are reflected on page 3 of exhibit 3f.

The ALJ's findings in terms of the medical record and Dr. Davis' evaluation are supported by the record. The medical record indicates that on **July 3, 2001**, Dr. Patricia Kapsner, Emerton's treating physician, found Emerton's left foot and left extremity pain decreased with heel pads and also noted "negative x-ray for heel spur." Tr. 219, 224 (negative x-ray report). Dr. Kapsner also noted Emerton's RSD was "stable on current infrequent use of Tylenol #3 (a narcotic analgesic)." *Id., see also*, Tr. 234 (January 31, 2000 visit to Dr. Kapsner– noted "reflex sympathetic dystrophy, stable); Tr. 236 (September 13, 1999 visit to Dr. Kapsner– noted "reflex sympathetic dystrophy, stable). At the July 3, 2001 visit, Dr. Kapsner also noted Emerton "did not want to pursue orthopaedics at the current time." Tr. 218.

On **May 2, 2001**, Emerton had x-rays of the left hip which also were normal. Tr. 225.

On **January 31, 2000**, Emerton saw Dr. Kapsner for a routine visit and reported having headaches and "worsening right knee pain." Tr. 233. Dr. Kapsner examination indicated small effusion of right knee and tenderness on extension and flexion. Dr. Kapsner recommended an orthopedic evaluation. Significantly, Dr. Kapsner noted Emerton's RSD was stable. Tr. 234. Emerton also reported taking Tylenol No. 3 "approximately 2 per week" for control of her pain. Tr. 233 (emphasis added).

On **April 3, 2000**, Dr. Wascher, Associate Professor of Orthopaedics, evaluated Emerton for complaints of bilateral knee pain. Tr. 232. The physical examination revealed no effusion, no ligamentous laxity, and no crepitus. *Id.* Her muscle strength was 5/5. She had strong distal

pulses.  The x-rays on that day were "essentially unchanged from two years ago, showing some mild degenerative disease of bilateral knees."  *Id.*  Dr. Wascher prescribed Celebrex for her pain, instructed her to lose weight, and told her to return as needed.

**On May 9, 2000**, Emerton saw Dr. Kapsner for a routine visit.  Dr. Kapnser noted "She saw Dr. Wascher and his assistant and was not really given much help as far as her knees are concerned.  They are still intermittently problematic, however, not swollen or giving out like they had been."  Tr. 230.  Dr. Kapsner's examination revealed a positive straight leg raise on the right.  Accordingly, Dr. Kapsner ordered a CT scan of her back.

On **September 19, 2000**, Emerton saw Dr. Kapsner for a routine visit and reported she was "doing okay" and complained of pain in her knees but "declin[ed] any further evaluation by orthopedics."  Tr. 228.  Dr. Kapsner's physical examination indicated no edema in her extremities and noted deep tendon reflexes were +2 and equal.  Tr. 229.

On **May 12, 1999**, Emerton returned for her routine follow-up visit with Dr. Kapsner.  Tr. 239.  Emerton reported chest pain.  The physical examination was unremarkable and the EKG was normal.  Emerton declined further evaluation to rule out coronary artery disease.  Dr. Kapsner noted Emerton's RSD of her right upper extremity was stable.  Tr. 240.

On **June 24, 1999**, Emerton returned for a follow-up visit with Dr. Kapsner.  Tr. 237.  Emerton reported having daily chest pain.  Dr. Kapsner diagnosed Emerton with "Atypical chest pain."  *Id.*  Again, Emerton refused further evaluation to rule out coronary artery disease.  Dr. Kapsner noted Emerton's RSD of her right upper extremity and her degenerative joint disease remained unchanged.

On **September 13, 1999**, Emerton saw Dr. Kapsner for a routine visit and reported she had not "had any real recurrences of her chest pain and declin[ed] any further evaluation at this time." Tr. 235. Dr. Kapsner's examination was essentially normal. Dr. Kapsner diagnosed Emerton with "Atypical chest pain. No significant recurrence, per patient." Tr. 236. Dr. Kapsner opted not to pursue further evaluation since Emerton declined to do so. Dr. Kapsner also noted, "Reflex sympathetic dystrophy. Stable." *Id.*

Dr. Davis' consultative evaluation indicates in relevant part as follows:

PHYSICAL EXAMINATION: Showed a woman who is alert and oriented. Blood pressure was 108/80, pulse 76, respiration 18, height 59 ½ inches, and weight 201 pounds. Corrected far vision, 20/50 on the right and 20/40 on the left; near vision, 20/100 on both eyes. Hearing and speech were intact. Her gait was slow, but she did not limp. although she brought an elastic brace and cane with her, she did not use either of these in the office. She would not really walk on her toes or heels, but she would squat down about half way. There was no crepitation in the knee.

Limb measurements in the upper and lower extremities were symmetrical without atrophy.

She has good mobility of the neck and mid back. In the lumbar region, she would forward bend about 40 degrees, extend backwards and side bend about 10 degrees. She reported some pulling discomfort in her legs, in the front of the thigh, with forward bending of the back. Seated straight leg raising was negative. There was no spasm, deformity, or tenderness in the back.

Examination of the upper extremities revealed symmetrical development. There were no atrophic changes of the skin or nails, skin was normal, and the temperature of the right upper extremity was the same as the left. Movements of the elbows, wrists, and digits were the same on both sides, at the right shoulder; she would abduct about 140 degrees but 180 degrees on the left side. Circulation in both upper extremities was normal. She demonstrated generalized decreased strength or effort in the right upper limb compared to the left.

Examination of the lower extremities showed good motion of the hips, knees, and ankles. She reported decreased appreciation of light touch over both lateral thighs. Otherwise, motor and sensory functions were intact. Deep tendon reflexes of the knees and ankles were 2+. She demonstrated full mobility of both knee joints, but complained of some discomfort with palpation around the anterior and medial aspect of the right knee. There was evidence of effusion today, and there was no joint instability or crepitation.

> SUMMARY: Examinee had apparently sustained some type of injury to the right upper extremity in 1986. She said that she was told she had reflex sympathetic dystrophy and has seen about 18 doctors received nerve blocks, surgery on the wrist, and so forth. She said nothing ever helped her. Today, on examination, there are no objective signs of reflex sympathetic dystrophy or neurological or vascular disorders. She reported that she does use her right upper limb to do some limited vacuuming, dish washing, and other activities, and that she puts her hand in a Crock-Pot full of hot paraffin daily, and that gives her some relief. There were two small arthroscopic scars in the right wrist, but no wrist crepitation or swelling was present. I do not see significant objective evidence of organic pathology to the right upper extremity. I do not have the prior records for review.
>
> She may have some mild arthritis of her right knee, but x-ray in April 1990 was stated to be negative. I did not find any ligamentous instability or other problems with knee today. She reports some areas of pain around the hips, and numbness in the thighs, but I did not see any particular explanation for that, although she may have a mild meralgia paresthetica, which affects superficial nerve branch in the thigh.
>
> She is overweight and deconditioned. She certainly would benefit from an exercise program and return to activities plus weight loss. She may have some difficulty doing sustained or heavier types of activities since she has been relatively inactive for many years now. Please correlate with any other records or documents.

Tr. 159-160.

Finally, in determining Emerton's RFC, the ALJ also relied on the Daily Activities form she completed prior to her February 23, 2001 evaluation by Dr. Davis. Tr. 156, Ex. 1F/3.[3] The ALJ found Emerton had the "ability to perform six separate exertional activities consistent with the ability to perform at least light work." Tr. 21. These "six separate exertional activities" are: (1) cleans house; (2) prepares meals; (3) washes dishes; (4) does laundry; (5) shops for food; and (6) drives car. The ALJ also relied on "six additional capacities" Emerton checked off on the same form. Tr. 156. These "six capacities" are: (1) reads; (2) watches television; (3) listens to

---

[3] Although in is decision the ALJ cited to page 3 of Exhibit 3f, that exhibit is a radiology report. Tr. 164. Exhibit 1F/3 is a Daily Activities form completed by Emerton and provided by Dr. G.T. Davis on the date of his consultative evaluation.

radio/stereo; (4) goes to church (very rarely); (5) bathes/brushes teeth; and (6) changes own clothes.

Emerton contends the ALJ's determination that she retained the RFC to perform light work is not supported by substantial evidence and is legally erroneous. Emerton argues the ALJ erred as a matter of law because there is no RFC assessment in the record and he failed to obtain one from Dr. Davis. The Court agrees. The Court has carefully reviewed the entire record and found no RFC assessment. However, Dr. Davis indicated Emerton "may have some difficulty doing sustained or heavier types of activities." Tr. 160. It is unclear to the Court what Dr. Davis meant by this statement or what kind of restrictions or limitations he would impose if he completed an RFC assessment form or a Medical Assessment of Ability to do Work-Related Activities (Physical) form.

The ALJ acknowledged that Dr. Davis found Emerton would have difficulty in sustaining activities but resolved this issue by relying on Emerton's Daily Activities form to conclude that she had the "ability to perform at least light work." Tr. 21. The ALJ's reliance on Emerton's Daily Activities form is not substantial evidence to support his RFC determination for light work. The ability to clean house, prepare meals, wash dishes, do laundry, shop for food and drive a car does not necessarily equate with the ability to work eight hours a day. Dr. Davis' Daily Activities form is a checklist. However, Emerton completed a Physical Daily Activities Questionnaire on January 8, 2001. Tr. 132. On that questionnaire, Emerton indicated she cleaned house but took her time doing it and would rest often. Emerton also indicated she washed dishes sitting on a stool and when she cooked she had to "sit often." Tr. 133. On remand, the ALJ should apply

11

Social Security Ruling 96-8p, consult with Dr. Davis and have him complete an RFC assessment form or a Medical Assessment of Ability to do Work-Related Activities (Physical) form.

**B. Credibility Determination**

"Credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence." *Diaz v. Secretary of Health and Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990). "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988). However, the ALJ's credibility determination does not require a formalistic factor-by-factor recitation of the evidence. *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). The ALJ need only set forth the specific evidence he relies on in evaluating claimant's credibility. *Id.* The ALJ may also consider his personal observations of the claimant in his overall evaluation of the claimant's credibility. *Id.*

In his decision, the ALJ cited to the medical record and found, "The claimant's assertions that she does not retain the residual functional capacity (RFC) necessary to light work are not credible." Tr. 21. Specifically, the ALJ noted Emerton's RSD remained stable. *Id.* The medical record supports this finding. On more than one visit, Emerton reported to Dr. Kapsner that she took Tylenol No. 3 about twice a week for her pain. Tr. 219, 233, 234. The ALJ also noted imaging studies of Emerton's knees indicated "only mild degenerative changes, with normal left foot and hip results." *Id.* The ALJ addressed Emerton's complaints of right knee pain, back pain, and left heel pain. Relying on the Daily Activities form, the ALJ also discredited Emerton's complaints of disabling pain. *Id.*

The ALJ set forth the specific evidence he relied on in evaluating Emerton' credibility. Because subjective complaints must be evaluated in light of a claimant's credibility as well as the medical evidence, the Court finds the ALJ's credibility determination was proper and supported by substantial evidence. Accordingly, the Court will not upset an ALJ's credibility determination where, as here, it is supported by substantial evidence.

**C.  Medical-Vocational Guidelines (the grids)**

The grids represent the Commissioner's administrative notice of the jobs that exist in the national economy at the various functional levels (i.e. sedentary, light, medium, heavy, and very heavy). *See Channel v. Heckler,* 747 F.2d 577, 579 (10th Cir. 1984). If the ALJ's findings of fact regarding a particular individual's age, education, training, and residual functional capacity all coincide with the criteria of a particular rule on these grids, the Commissioner may conclude that jobs suitable for the claimant exist in the national economy and that the claimant therefore is not disabled. *Id.*

Because the grids classify RFC based only on exertional or physical strength limitations, they may not be fully applicable to claimants with nonexertional impairments. See 20 C.F.R. 416.967; *Channel,* at 580-81. Nonexertional impairments are medically determinable impairments, including pain, that do not directly limit physical exertion, but may reduce an individual's ability to perform gainful work nonetheless. *Id.* at 580.

If nonexertional impairments narrow the range of possible work the claimant can perform, the Commissioner may only use the grids as a "framework" for determining whether, in light of all claimant's impairments, he has meaningful employment opportunity within the national economy. 20 C.F.R. pt. 404, subpt. P, App.2, 200 (e) (2). In such cases, the Commissioner must also

produce a vocational expert to testify whether specific jobs appropriate to claimant's limitations exist in the national economy. *Channel*, 747 F.2d at 581. However, when an ALJ finds, based on substantial evidence, that a claimant's nonexertional impairments do not limit the range of jobs available to her, he may apply the grids conclusively. *See, e.g., Glass v. Shalala*, 43 F.3d 1392, 1396 (10th Cir. 1994).

Emerton contends she has significant nonexertional impairments that preclude conclusive reliance on the grids. Specifically, Emerton claims she suffers from RSD in her right upper extremity "as evidenced by pain, diminished motion, and decreased strength." Mem. Supp. Mot. to Reverse at 21. However, Dr. Davis found "no objective signs of reflex sympathetic dystrophy" and no "significant objective evidence of organic pathology to the right upper extremity." Tr. 160. Dr. Davis also noted, "She demonstrated generalized decreased strength **or effort** in the right upper limb compared to the left." *Id*. (emphasis added). Additionally, the medical records do not support Emerton's complaints of disabling pain due to her RSD.

Emerton also contends she experiences arm and bilateral knee pain. However, to qualify as disabling, pain must be severe enough– either by itself or in combination with other impairments– to preclude any substantially gainful employment. *See Brown v. Bowen*, 801 F.2d 361, 362-63 (10th Cir. 1986). Depending on Dr. Davis' RFC assessment, on remand, the ALJ may want to consult with a vocational expert.

### D.  Conclusion

The Court's review of the ALJ's decision, the record, and the applicable law indicates the ALJ's decision should be remanded for the limited purpose of having Dr. Davis complete an RFC assessment form or a Medical Assessment of Ability to do Work-Related Activities (Physical)

form. However, the Court expresses no opinion as to the extent of any impairment, or whether Emerton is or is not disabled within the meaning of the Social Security Act.

The ALJ also should consider Dr. Kapsner's June 29, 2002 clinical note in which she claims Emerton is disabled due to RSD, degenerative joint disease, and chronic pain. Tr. 12. This statement of disability was not before the ALJ. However, the Appeals Council considered it and rejected it. Tr. 4-5. The Appeals Council found Dr. Kapsner's clinical notes, from April 1999 to July 2001, did not support her statement of disability. *Id.* Nonetheless, the ALJ should consider it along with Dr. Davis' RFC assessment.

A judgment in accordance with this Memorandum Opinion and Order will be entered.

**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**